IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

EBRIMA JALLOW,

                    Plaintiff,                  OPINION AND ORDER

    v.

KRAFT FOODS GLOBAL, INC.,                  15-cv-249-wmc

                    Defendant.

---

      Plaintiff Ebrima Jallow asserts claims for interference and retaliation under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, against his former employer defendant Kraft Foods Global, Inc.  Pending before the court is defendant Kraft's motion for summary judgment.  (Dkt. #11.)  Because the court finds that plaintiff has failed to offer sufficient evidence from which a reasonable jury could find that he was eligible for FMLA leave in late April 2013, the court will grant defendant's motion, enter judgment in its favor on both FMLA claims, and close this case.

UNDISPUTED FACTS[1]

**A.  The Parties**

      Plaintiff Ebrima Jallow worked at defendant Kraft's Oscar Meyer facility in Madison, Wisconsin from May 14, 2001, until April 26, 2013.  During his employment, Jallow held various positions, but for the majority of his tenure, he worked in the Sanitation Department.  As a member of that department, Jallow worked in other departments, including the JCON1, KS1, Alkar and Saran Tube departments, as well as

---

[1] Unless otherwise noted, the court finds the following facts undisputed and material for the purpose of deciding the present motion.

in the "roustabout position," which involves covering a variety of jobs within the Sanitation Department as a replacement for other employees who are on vacation or out sick.

Luke Wiedenfeld was the supervisor of the Sanitation Department during Jallow's employment. Laura Newman was the Assistant Human Resources Manager at Kraft's Madison facility in 2013. Her job responsibilities included reviewing FMLA requests and supporting employee relations within the Sanitation Department.

### B. Plaintiff's FMLA Leave History at Kraft

Over the period of his employment with Kraft, Jallow requested and received FMLA leave on numerous occasions, including for the birth of a child and for his own health conditions, including hyperthyroidism. Based on past experience, Jallow testified at his deposition that he understood Kraft's FMLA policy allowed two days from an employee's return to work to request an FMLA absence, and then fourteen days to submit completed FMLA paperwork to Laura Newman in human resources. Jallow could recall only one occasion during his employment when he requested FMLA leave and the request was denied because he failed to make his request within two days of returning to work.[2]

---

[2] Plaintiff points out that his request for FMLA leave April 22-26, 2013, was also denied, but given that this request occurred after his employment was terminated, defendant's characterization of Jallow's experience above is fair. (*See* Def.'s Reply to Def.'s PFOFs (dkt. #28) ¶ 17.)

### C. Jallow's 2013 Absences

In the first four months of 2013, Jallow missed 35 days of work, with 30 of those absences occurring in March and April. Except for his March 4-6, 2013, absence, plaintiff did not request FMLA leave for any absences. In March 2013, Kraft issued a written warning to plaintiff regarding his poor attendance during that month, putting him on notice that his attendance record was "unacceptable, and must be improved." (Def.'s PFOFs (dkt. #13) ¶ 39.)[3]

### D. Plaintiff's Position and Start Time

Jallow's shift start time varied at different points in his career, though it was his duty to find out what his start time for the following day would be. (Jallow Depo. (dkt. #16) 74.) The parties dispute what Jallow's start time was on April 24 and 25, 2016. While plaintiff contends that his start time was 10:00 p.m., Kraft contends that it was 7:00 p.m., largely relying on the fact that Jallow's start time for every day he worked in 2013 was 7:00 p.m., except for three days when it was 9:00 p.m., and that on a March 4-6, 2013, FMLA certification form, Jallow indicated that his regular shift began at 7:00 p.m. (Def.'s PFOFs (dkt. #13) ¶¶ 9-12.) Plaintiff acknowledges that his start time for much of 2013 was 7:00 p.m., because he was covering a temporary vacancy, but disputes that this this was his start time in late April 2013.

---

[3] In March 2013, Jallow requested a six-week leave of absence from Kraft. He told his supervisor that he needed the leave to travel to Africa. The request was denied because Kraft did not have sufficient staff to cover plaintiff's position for that extended of a period of time. It is not clear how this proposed fact is relevant to the issues to be decided by the court at summary judgment, though this fact may be relevant if this case were to proceed to trial for purposes of assessing Jallow's credibility.

In its response to defendant's motion for summary judgment, plaintiff posits that he served in the roustabout position in 2013, and that position had a flexible starting time between 3:00 p.m. and 11:00 p.m., depending on whether there was a temporary vacancy within the Sanitation Department. Defendant, however, asserts in its reply that he was no longer in a roustabout position in April 2013. Instead, on October 8, 2012, Jallow signed up for and won the saran tube/classics position, which he began working on December 18, 2012.[4] Still, defendant's evidence stops short of establishing a set start time for the saran tube/classics position of 7:00 p.m., and indeed, Jallow testified during his deposition that he did not always start at 7:00 p.m. in the saran tube department. (Jallow Depo. (dkt. #16) 24.)

### E. Plaintiff's Termination from Kraft

Plaintiff was absent from Kraft the entire workweek beginning Monday, April 22, 2013. Jallow testified at his deposition that he had a cold that week, and he was "[j]ust generally tired and taking some meds which were . . . making me drowsy." (Def.'s PFOFs (dkt. #13) ¶ 42.) Jallow further explained that he was suffering from "[a] common cold [that] was there usually; [y]eah, some of those symptoms," claiming that he was unable to perform his job at Kraft because he "could not do anything that physical." (*Id.*)

---

[4] Defendant represents that during the course of investigation for this case, it discovered evidence that Jallow was no longer in the roustabout position in April 2013. Consistent with this evidence, defendant also filed a motion for leave to file an amended answer, specifically amending its answer of paragraph 6 of the complaint alleging that Jallow worked in a roustabout position in April 2013 from "admits" to "denies." (Dkt. #26.) Plaintiff did not file any opposition to defendant's motion. Accordingly, the court will grant defendant's motion to file an amended answer. The operative pleading is located at dkt. #26-1.

As described above, Kraft maintains that his shift began at 7:00 p.m. each day that week, and there is no dispute that Jallow called the Absenteeism Reporting Service ("ARS") at 4:37 p.m. on April 22, to report that he was sick and would not be coming to work. Jallow also visited an urgent care clinic at 6:30 p.m. that night for "Cough and/or Chest Congestion" and was diagnosed with "Cough" and "Nasal congestion." (Def.'s PFOFs (dkt. #13) ¶ 45.) On April 23, Jallow also called the ARS at 4:51 p.m. to report that he was too sick to come into work. On April 24, plaintiff waited until 8:10 p.m. to call ARS and report that he was sick again and would not be coming into work. On April 25, plaintiff did not call until 9:11 p.m. to report that he was too sick to come into work yet again. Also on April 25, Jallow returned to the urgent care clinic at 6:12 p.m. for the same cold symptoms.

Having failed to call ARS on April 24 and 25 before 7:00 p.m. -- the start of his shift, at least according to defendants -- Jallow accumulated two consecutive AWOL/Unexcused absences under the Attendance Policy. While plaintiff concedes that a failure to call before his shift on those two days would constitute two AWOL/Unexcused absences, he contends that his shift did not begin until 10:00 p.m., and therefore that his calls to ARS were made before the start of his shift.

According to the Attendance Policy, two consecutive AWOL/Unexcused absences are grounds for termination. As such, Kraft terminated plaintiff's employment on April 26, 2013. That same day, Kraft sent a termination letter invoking its policy to both Jallow and the Union, and Jallow learned of his termination the same day from the Union.

5

On April 29, 2013, the Union filed a grievance on Jallow's behalf. Jallow exhausted all levels of the grievance process. At the grievance hearings, Jallow stated that he did not know what time his shift started on the days in question and that he may have been asleep due to his medications. Jallow also mentioned knee surgery and being at the doctor's office as possible reasons for his failure to call in before the start of his shift. Jallow's grievance was denied at each step, and the Union declined to pursue arbitration.

### F. Jallow's Post-Termination Request for FMLA

The Friday following his termination, on May 3, 2013, Jallow submitted an FMLA request and medical certification for his absences from April 22 to May 1, 2013, to Kraft's HR department. Plaintiff points out that this request was timely, since it was submitted within 48 hours of May 1, the end date of his requested FMLA leave. The medical certification, signed by a doctor at the urgent care clinic Jallow had visited the week of April 22nd, indicated that Jallow was "unable to perform duties during the time of illness 4/20/13 - 4/26/13," and estimated his period of incapacity as "4/22/13-4/26/13." (Def.'s Exs., Ex. 10 (dkt. #14-10) pp.4-5.)[5] The form, however, did not state what condition caused Jallow to be unable to work, nor did it list any essential elements of his job that Jallow would not be able to perform.

---

[5] The form notes that the response of "yes" to the question "[i]s the employee unable to perform any of his /her job functions due to the condition?," was corrected on May 6, 2013. Presumably, the doctor completing the form originally checked "no." (Def.'s Exs., Ex. 10 (dkt. #14-10) p.4.) This ambiguity is not material to the court's ruling.

6

### G. Kraft's Request of Plaintiff's Medical Records

Jallow represents that Laura Newman requested that he provide medical documentation to demonstrate his serious health condition to support his March 2013 FMLA request. Newman disputes that she ever made such a request. Indeed, Newman testified that Kraft did not even have an authorization for release of medical records form in 2013.[6] Regardless, four pages of medical records were found in Jallow's Kraft personnel file. The cover letter accompanying those pages is dated March 25, 2013, from "iod Incorporated," and sent to Ebrima Jallow at Kraft's address in Madison, Wisconsin. (Jallow Decl., Ex. A (dkt. #25-1).) In addition, there is an authorization for release of medical information form for UW Health, signed by Jallow, dated March 12, 2013, directing that the records be sent to Kraft. (*Id.* at p.2.)

The timing is potentially material because listed at the bottom of one of the pages of the medical records as part of his medical history is plaintiff's 2005 HIV diagnosis. (*Id.* at p.6.) Plaintiff admits that he never told Newman, Wiedenfeld or anyone else at Kraft of this diagnosis, including during the grievance process. Plaintiff nevertheless contends that a reasonable jury could infer Kraft learned of his status through his medical records, which were received on March 25, 2013, approximately one month before his termination. In contrast, Newman and Wiedenfeld represent that they did not learn of plaintiff's HIV status until he filed this lawsuit.

---

[6] Moreover, Wiedenfeld averred that he did not review Jallow's FMLA records at any time during his employment with Kraft.

**H. Jallow's Employment at Wisconsin Department of Health Services**

In March 2013, Jallow began a new job as a Psychiatric Care Technician at the Wisconsin Department of Health Services ("WDHS").[7] Plaintiff's job at WDHS required him to lift, move and restrain other adults and required him to be prepared for physical activity at any time. While not disputing that this job required much physical activity, plaintiff contends that during April 2013, he was in a "training position," which was "primarily classroom in nature." (Pl.'s Resp. to Def.'s PFOFs (dkt. #22) ¶ 28.) Still, at his deposition, Jallow testified that the classroom training included physical activity; indeed, it was during this training on April 25, 2013, that he injured his knee. (Def.'s Reply to Def.'s PFOFs (dkt. #28) ¶ 28; *see also* Def.'s PFOFs (dkt. #13) ¶ 29 (describing training as involving learning how to help a patient out of a wheelchair and restraining a patient during a crisis).)

Jallow worked at WDHS for a total of 15 days in March and 21 days in April 2013, including on each of the workdays that Jallow was absent from Kraft. On each of the weekdays that Jallow was absent from Kraft from April 22-25, 2013, Jallow worked full eight-hour shifts at WDHS from 8:00 a.m. to 4:30 p.m. At his deposition, Jallow acknowledged his work with WDHS on April 24-25, but testified that he did not consider himself physically capable of performing his work for Kraft on those days.

---

[7] Plaintiff points out that he worked multiple full-time, and part-time jobs over the course of his 12-year employment with Kraft, something of which Kraft was apparently aware, even providing references at time. Plaintiff, however, considered Kraft to be his primary employment, receiving all of his benefits from Kraft.

OPINION

Plaintiff asserts clams for interference with his rights under the FMLA, 29 U.S.C. § 2615(a)(1), and retaliation based on his attempted exercise of his rights under the FMLA, 29 U.S.C. § 2615(a)(2). Defendant moves for summary judgment on both claims, positing several bases. The court will take up each claim in turn.

I. FMLA Interference Claim

The FMLA provides that an eligible employee may take up to twelve weeks of leave during any twelve-month period if he is unable to perform the functions of his position because of a serious health condition. 29 U.S.C. § 2612(a)(1)(D). To prove an FMLA interference claim, Jallow must demonstrate that: (1) he was eligible for the FMLA's protections; (2) Kraft was covered by the FMLA; (3) he was entitled to take leave under the FMLA; (4) he provided sufficient notice of his intent to take leave; and (5) Kraft denied him FMLA benefits to which he was entitled. *Pagel v. Tin, Inc.*, 695 F.3d 622, 627 (7th Cir. 2012) (internal citation and quotation marks omitted). Defendant contends that it is entitled to summary judgment because the undisputed facts compel a finding that Jallow was not entitled to take leave under the FMLA, as well as that he failed to provide sufficient notice of his entitlement.

An eligible employee is entitled to FMLA leave if "(1) [h]e is afflicted with a serious health condition and (2) that condition renders h[im] unable to perform the functions of his job." *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 669 (7th Cir. 2011) (quotations omitted). As to the first eligibility prong, a "serious health condition

entitling an employee to FMLA leave means an illness, injury, impairment or physical or mental condition that involves inpatient care as defined in § 825.114 or continuing treatment by a health care provider as defined in § 825.115." 29 C.F.R. § 825.113(a).

In his opposition to defendant's motion for summary judgment, plaintiff claims entitlement to FMLA leave under the regulation's provision for "continuing treatment of a chronic condition." That provision defines a chronic serious health condition as one that:

> (1) Requires periodic visits (defined as at least twice a year) for treatment by a health care provider;
>
> (2) Continues over an extended period of time (including recurring episodes of a single underlying condition); and
>
> (3) May cause episodic rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.).

29 C.F.R. § 825.115(c).[8] Unfortunately for plaintiff, he did not offer *any* evidence of at least biannual periodic doctor visits because of his HIV status, nor that he experienced episodic incapacity because of his HIV status.

Indeed, the excerpts from the medical records submitted by defendant at summary judgment only reveal two visits over an 18-month period of time (January 2012 to July 2013) for treatment, or what more accurately amounts to monitoring, of Jallow's HIV. (*See* Def.'s Reply Exs., Ex. 3 (dkt. #30-3) pp.8-12 (1/31/12 visit with UW Health

---

[8] In support of his request for FMLA, plaintiff submitted a medical authorization form, in which the physician stated that Jallow was "unable to perform duties during the time of illness 4/20/13 - 4/26/13," and estimated his period of incapacity as "4/22/13-4/26/13." (Ex. 10 (dkt. #14-10) pp.4-5.) In opposing defendant's motion, plaintiff does not, however, rely on his short term virus or cold independent from his HIV status, and for good reason. Plaintiff's work with WDHS on those same days would likely undermine any finding of incapacity under 29 C.F.R. § 825.115(a), which is not tied to a chronic condition.

infectious disease doctor); pp.19-20 (7/31/13 appointment with UW internal medicine physician reviewing HIV and latent TB.) Moreover, in those same records, the doctors noted that Jallow's "HIV is under excellent control," and indeed "is undetectable." (*Id.* at 19-20.) Similarly, in a record from March 14, 2013, where Jallow's HIV status was simply noted as part of his medical history, the doctor described Jallow's HIV as "asymptomatic," that his condition was "stable, [and that the patient] reports undetectable viral load for several years now." (*Id.* at p.15.)[9]

Instead of offering contrary medical evidence, plaintiff simply states in his brief, without *any* medical or legal support that, "[w]hile a common cold by itself may not qualify for FMLA coverage, a cold in conjunction with HIV is a compounded chronic serious health condition." (Pl.'s Opp'n (dkt. #24) 8 (emphasis in original); *see also id.* at 10 ("[A]ny person with a basic understanding of HIV knows that any viral illness -- however small -- can become serious for Jallow.").) Actually, the relationship between testing positive for HIV and resistance to the common cold is far less clear, since "[a] cold normally lasts a week and goes away on its own, even in people with HIV." *HIV/AIDS and the Common Cold*, WebMD.com, http://www.webmd.com/cold-and-flu/cold-guide/hiv-aids-colds (last visited July 14, 2016). Even if a cold might linger longer (or lead to complications) for someone with a comprised immune system, plaintiff

---

[9] While these medical records were submitted by defendant, plaintiff failed to submit any of his own, other than the six pages located in his personnel file. Moreover, plaintiff failed to even submit a declaration describing any treatment or medical monitoring of his HIV status during the relevant period of this case. As the Seventh Circuit frequently notes, summary judgment is the time when the party with the burden of proof at trial must "'put up or shut up,' when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (quoting *Schnacht v. Wis. Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999)).

has not only failed to offer any evidence that he falls into this category (*i.e.*, submit evidence that he suffered a complication from the cold like pneumonia), the evidence of record suggesting Jallow is asymptomatic is again to the contrary.

More importantly, "[w]hether an illness or injury constitutes a 'serious health condition' under the FMLA is a legal question that the employee may not sidestep in the context of summary judgment merely by alleging his condition to be so." *Haefling v. United Parcel Serv., Inc.*, 169 F.3d 494, 499 (7th Cir. 1999). The Seventh Circuit has recently clarified that expert testimony is not required to prove a serious health condition, *but* plaintiff is still required to put forth medical evidence to support a finding that he was afflicted with a serious health condition at the time that he requested FMLA. *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 838-39 (7th Cir. 2014) (holding that "expert medical testimony is *not* required to prove the incapacity," but noting that the plaintiff had presented "medical documentation" to support a jury finding of FMLA eligibility). This, Jallow has not done.

In concluding that Jallow failed to come forward with sufficient evidence to support a reasonable jury finding that he suffers from a chronic serious health condition, the court stresses that this holding in no way should be read broadly to apply to HIV diagnoses more generally. In other words, nothing about this holding casts doubt on whether HIV could constitute a chronic serious health condition. Here, however, plaintiff has failed to put forth medical documentation to support such a finding, and the limited medical evidence in the record supports a finding that his HIV is well-controlled and virtually undetectable. Perhaps, plaintiff's case is representative of advancement in

treatment of HIV/AIDS. Regardless of the reason, the undisputed record does not support a finding of eligibility under the FMLA.

Relatedly, defendant also seeks summary judgment on the alternate basis that even if plaintiff were to demonstrate that his HIV status is a serious health condition, he cannot meet the second prong of the eligibility test -- that his HIV condition "renders h[im] unable to perform the functions of his job," *Ames*, 629 F.3d at 669. First, defendant's attempt to analogize his situation to that of an employee with Type 1 diabetes attempting to rely on that condition to seek FMLA for a stubbed toe is borderline absurd. (*See* Def.'s Reply (dkt. #27) 7.) Other than his counsel's conclusory statements in his opposition brief, plaintiff ultimately has failed to provide evidence that the virus he experienced on the last week of April 2013 was due to or otherwise exacerbated by his HIV status. Certainly, a jury would have to speculate to make any such finding.

Having found that plaintiff failed to put forth sufficient evidence from which a reasonable jury could find that Jallow was entitled to FMLA leave in late April 2013, the court need not reach defendant's other bases for summary judgment. Still, the court notes that plaintiff appears to have raised a genuine issue of material fact with respect to (1) whether defendant had notice of his HIV status given Kraft's receipt of his March 2013 medical records and (2) the start time of Jallow's shift on April 24 and 25, 2013, for purposes of determining whether he failed to follow Kraft's usual and customary procedures.

**II. FMLA Retaliation Claim**

Here, plaintiff's retaliation claim "stands or falls with his interference claim." *Hansen*, 763 F.3d at 835. As the Seventh Circuit recently explained, if a plaintiff was entitled to take leave under the FMLA for the absences which resulted in his termination, than the plaintiff can "establish a prima facie case of FMLA retaliation: It is undisputed that he incurred attendance points for those absences and those points led to the termination of his employment." *Id.* at 835 n.1. In light of the court's finding that Jallow failed to put forth sufficient evidence from which a reasonable jury could find him eligible for FMLA leave, plaintiff cannot rest a retaliation claim on his April 24-25, 2013, absences.

To the extent plaintiff's retaliation claim rests on the protected activity of some other, earlier request for FMLA leave for which he was eligible, Jallow fails to put forth any evidence from which a reasonable jury could find retaliatory intent. *See Pagel v. Tin, Inc.*, 695 F.3d 622, 626 (7th Cir. 2012) ("The difference between the two theories is that a retaliation claim requires the employee to prove discriminatory or retaliatory intent while an interference claim only requires the employee to prove that the employer denied him entitlements provided by the Act."). Instead, in support of his claim under the direct method, plaintiff simply cites to the timing of Kraft's receipt of his medical records revealing his HIV status in late March 2013 and his April 2013 termination, and notably, fails to cite to any other FMLA requests during this period of time. (Pl.'s Opp'n (dkt. #24) 18.) "Suspicious timing alone rarely is sufficient to create a triable issue" and on a motion for summary judgment "mere temporal proximity is not enough to establish

14

a genuine issue of material fact." *Cole v. Illinois*, 562 F.3d 812, 816 (7th Cir. 2009) (quoting *Andonissamy v. Hewlett-Packard Co.,* 547 F.3d 841, 851 (7th Cir. 2008) (internal quotation marks omitted).[10]

Accordingly, the court also will grant summary judgment to defendant on plaintiff's FMLA retaliation claim.

CONCLUSION

The court's holding today that plaintiff failed to put forth sufficient evidence from which a reasonable jury could find Jallow eligible for FMLA is a very narrow one, specific to the lack of evidence in this case. In particular, the court is *not* ruling that HIV cannot satisfy the definition of a chronic serious health condition under the FMLA. Here, plaintiff simply failed to put forth evidence to support that conclusion. The court also notes that the record here *might* support a claim of discrimination based on plaintiff's HIV-positive status as hinted at by plaintiff's opposition on summary judgment, but plaintiff did not allege a discrimination claim under the ADA or other law.

ORDER

IT IS ORDERED that:

1) Defendant's motion for summary judgment (dkt. #11) is GRANTED.

---

[10] Plaintiff also points to the defendant (purportedly) ignoring the fact that Jallow called in late for one shift in March as evidence that Kraft terminated Jallow because of his attempt to exercise his rights under the FMLA. (Pl.'s Opp'n (dkt. #24) 18-19.) The court is hard-pressed to see any connection between his retaliation claim and this fact, especially given that it was *two* consecutive unexcused absences which resulted in Kraft's termination decision. Regardless, Kraft's prior treatment of one late call, coupled with the timing of the March 2015 receipt of medical records, still does not form a sufficient basis from which a jury could infer retaliatory intent.

2) Defendant Kraft Foods Global, Inc.'s unopposed motion to amend/correct answer (dkt. #26) is GRANTED.

3) The clerk of court is directed to enter judgment in favor of defendant and close this case.

Entered this 14th day of July, 2016.

                        BY THE COURT:

                        /s/

                        _____
                        WILLIAM M. CONLEY
                        District Judge

Case: 3:15-cv-00249-wmc Document #: 38 Filed: 07/14/16 Page 16 of 16